UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH NATHAN, Chapter 7 Trustee
for the Bankruptcy Estate of Nicole Massey,          Case No. 19-cv-10131

                         Plaintiff,          Paul D. Borman
v.                                           United States District Judge

GREAT LAKES WATER AUTHORITY,                 Elizabeth A. Stafford
                                             United States Magistrate Judge
                         Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT GREAT LAKES WATER AUTHORITY'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 14)

### I.  INTRODUCTION

Now before the Court is Defendant Great Lakes Water Authority's Motion for Summary Judgment in this employment discrimination case. (ECF No. 14.) The original plaintiff in this case, Nicole Massey, filed for bankruptcy during the pendency of this case, so Kenneth Nathan, the Chapter 7 Trustee for her bankruptcy estate, was substituted in the place of Massey. (ECF No. 10.) Nathan has the exclusive right to assert Massey's claims, and stands in her shoes for the purpose of this case. *In re Cannon*, 277 F.3d 838, 853 (6th Cir. 2002).

Nathan, on behalf of Massey, claims that Defendant Great Lakes Water Authority (GLWA) violated Title VII, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliot-Larson Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2201 *et seq.*, through sexual harassment and gender discrimination that created a hostile work

environment for Massey, and by retaliating against Massey when she complained about that harassment and discrimination. (ECF No. 1, Complaint, PgID 2–8.) Nathan also alleges that GLWA violated the Family Medical Leave Act (FMLA), 29 U.S.C. § 2611 *et seq.*, by discriminating and retaliating against Massey for taking or attempting to take protected leave. (*Id.* at PgID 8–10.)

As described below, Massey fails to create a genuine issue of material fact regarding crucial elements of each of her claims. Accordingly, the Court grants Defendant's Motion for Summary Judgment. (ECF No. 14.)

## II.    FACTS

Because this is a Motion for Summary Judgment, the following facts are recounted in the light most favorable to the non-moving party—here, Nathan on behalf of Massey. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### A.    Detroit Water and Sewerage Department Employment

Nicole Massey was employed as a security officer for the Detroit Water and Sewerage Department of the City of Detroit (DWSD) from September 30, 2004 until December 31, 2015, when she resigned pursuant to the transfer of authority from DWSD to GLWA. (ECF No. 14-2, Massey Dep., PgID 151.) Her employment as a security officer with GLWA started the following day. (*Id.*; *see also* ECF No. 14-3, DWSD Transition Resignation Form, PgID 213.) Throughout

2

her employment with DWSD, Massey was approved for intermittent FMLA leave for her asthma. (ECF No. 14-39, FMLA Letter, PgID 441.)

During Massey's eleven years with DWSD, she had ongoing issues with her supervisor, Sergeant Tonya McNair, formerly known as Tonya Bell. (ECF No. 14-2, Massey Dep., PgID 189–90.) In addition to yelling at Massey, getting into swearing fights with her, and generally treating her poorly, Sergeant McNair also called Massey "the queen of FMLA," a nickname she used "all the time." (*Id.* at 190.) Other supervisors and guards at DWSD also called Massey "the queen of FMLA." (*Id.*) Massey reported the use of this nickname, and reported that Sergeant Bell and others at DWSD discussed her medical condition to her coworkers, made disparaging comments about her breast size, weight, looks, and smell, and interfered with her ability to use FMLA leave to the City of Detroit Human Rights Department in 2010. (ECF No. 21-4, Human Rights Report, PgID 664–82.) After investigation, the Human Rights Department found the disability discrimination unsubstantiated, but stated that the allegations were "troubling." (*Id.* at PgID 665.)

Massey alleges that Sergeant McNair routinely denied her approved FMLA leave during her employment with DWSD. (ECF No. 21, Response, PgID 557.) On August 11, 2015, Massey filed a complaint with the Human Resources (HR)

department claiming that Sergeant McNair always denied her FMLA requests, and that on three occasions, denied her leave when she was experiencing shortness of breath and requested leave to go home or to the hospital. (ECF No. 21-5, Investigation Report, PgID 685–86.) On one of these occasions, Massey became so ill that Sergeant McNair had to call an ambulance to take Massey to the hospital. (*Id.*) At least once after McNair denied Massey's request to leave, Massey ended up needing overnight treatment at the hospital. (*Id.*; ECF No. 21-6, ER Report, PgID 689–90.)

Massey's claims were investigated by both DWSD and GLWA in early 2016, after the transition from DWSD to GLWA. (ECF No. 21-5, Investigation Report, PgID 684.) Sergeant McNair and her supervisor, Lieutenant Slaughter, denied Massey's claims as untrue, and the former guards Massey identified as witnesses were not successfully contacted. (*Id.* at PgID 686–87.) Thus, her claims were found to be unsubstantiated. (*Id.* at PgID 687.)

Massey said that she was subjected to ridicule and harassment based on the size of her breasts throughout her employment with both DWSD and GLWA. (ECF No. 21, Response, PgID 556.) Vallorie Parks-Turner, the HR Generalist to whom Massey reported, remembered receiving complaints from Massey that

4

coworkers teased her and made comments about her breast size and the way her shirt fit. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) She did not remember exactly who was teasing Massey, but stated that she thought it was Sergeant McNair. (*Id.*) Further, Massey alleges that, in October of 2012, Chief Security Officer W. Barnett Jones had a supervisor, Annette Wilson, go to Massey's post to check to see if she was wearing a bra. (ECF No. 14-2, Massey Dep., PgID 173–74.) At one point in her deposition, Massey referred to this experience as "someone going into [her] shirt and checking to see if [she was] wearing a bra," (*id.* at PgID 209), but HR Generalist Parks-Turner said that her recollection of Massey's report was "[j]ust that they asked if she had a bra on." (ECF No. 14-13, Parks-Turner Dep., PgID 279–80.)

## B.     GLWA Employment

On January 1, 2016, GLWA took over the regional water and sewer systems under leases from the City of Detroit, thereby becoming Massey's new employer. (ECF No. 15-1, Offer Letter, PgID 479.) GLWA, a wholly separate legal entity from the City of Detroit and DWSD, was a separate employer, but Massey and many of her fellow DWSD employees were able to retain their wages, job

classification, and seniority when their jobs were moved from DWSD to GLWA. (*Id.* at PgID 479–80.)

Thus, the only notable change to Massey's job under GLWA was that she was required to carry a gun and a taser and to wear a bulletproof vest. (ECF No. 14-2, Massey Dep., PgID 151.) She was still supervised by Sergeant McNair, and continued to have problems with McNair treating her poorly and calling her the queen of FMLA. (*Id.* at PgID 190.) Massey also heard other supervisors who had transferred from DWSD, including Chief of Security Jones, call her by this name in early 2016. (*Id.* at PgID 190–91.)

According to a letter written by fellow officer David Yarnall, during two shifts in June, 2016, Massey vented to him about her problems with Sergeant McNair and other work issues. (ECF No. 21-8, Yarnall Letter, PgID 698.) Massey told him that officers made up lies to get her written up and fired, that, once, McNair would not allow her to leave work when "'her woman time happened' and she messed all over her uniform," that, once, McNair denied her request to leave early when she was not feeling well and she eventually ended up needing EMS transport to the hospital, that she was called "the 'Stinky one', 'messy one', and the 'FMLA person,'" that she had a bad reputation for calling off last minute due to

FMLA, that she was made fun of due to her breast size, that she was once accused of not wearing a bra to work, and that "many people have harassed her about her breast size over the years." (*Id.*) Officer Yarnall sent this letter on June 13, 2016 to Lieutenant Slaughter, Sergeant McNair, and Sergeant Brooks, which prompted McNair to pen a letter to Chief of Security Jones. (ECF No. 21-8, McNair Letter, PgID 699.) McNair's letter summarized Yarnall's report and then stated that Massey's conversation was "totally inappropriate and unacceptable," that it created a disruptive work environment, and said that she would issue disciplinary action against Massey as a result. (*Id.*) McNair's letter prompted an investigation in which Yarnall clarified that Massey had not made him uncomfortable but that he thought the conversation was inappropriate in the workplace and so wrote the report to protect himself. (ECF No. 21-8, Yarnall Investigation, PgID 697.)

Shortly after receiving Yarnall's letter, in late June or early July of 2016, Sergeant McNair conducted an evaluation of Massey. (ECF No. 14-2, Massey Dep., PgID 170.) McNair gave Massey a score of 69 on an evaluation test "due to the fact that [Massey's] uniform looks sloppy most of the time" because Massey's bra was not supportive enough. (*Id.* at PgID 170–71.)

Also around this time, on June 25, 2016, McNair issued a Corrective Disciplinary Action against Massey for being absent without leave for her shift on June 21, 2016. (ECF No. 21-10, 2016 Corrective Action, PgID 703.) According to the form, Massey "failed to make verbal contact with her immediate supervisory for the approval of a vacation request." (*Id.*) This resulted in a five-day suspension. (*Id.*) Massey felt that this was retaliation for her complaint to the Human Rights Department accusing McNair of disability discrimination, because she had attempted to contact McNair to get approval for leave but McNair did not respond. (ECF No. 14-2, Massey Dep., PgID 189; ECF No. 21-11, Union Grievance, PgID 705.) Massey also believed that McNair was retaliating because McNair called her a "snitch" when she "would go to HR about some of the things [McNair] would say and do." (ECF No. 14-2, Massey Dep., PgID 181.)

So, on July 6, 2016, Massey filed a charge with the Equal Employment Opportunity Commission (EEOC) against DWSD for retaliation and disability discrimination based on the three asthma incidents in 2015. (ECF No. 14-9, 2016 EEOC Charge, PgID 262; ECF No. 14-11, EEOC Intake Form, PgID 270–73.) As the EEOC started its investigation, McNair continued to call Massey a snitch. (ECF No. 14-2, Massey Dep., PgID 181.) Massey received a right to sue letter on

8

this charge on February 9, 2017, but did not pursue the claim further. (ECF No. 14-12, 2017 Right to Sue, PgID 275.)

Another action taken against Massey by GLWA supervisors in the summer of 2016 was requiring her to complete additional gun training and improve her performance with her gun in 30 days or face termination  (ECF No. 14-2, Massey Dep., PgID 181.) Massey felt that this requirement may have been retaliation for her EEOC charge, but was not certain. (*Id.*)

In September of 2016, Massey was transferred from securing the wastewater treatment plant to the southwest water plant. (ECF No. 14-2, Massey Dep., PgID 155.) At that time, or shortly thereafter, Sergeant McNair ceased being Massey's supervisor. (*Id.* at PgID 181.) Massey spent a year working at the southwest plant before she was transferred to the northeast water plant on October 2, 2017, pursuant to a normal rotation of duties intended to "provide all officers with training on Operational procedures at different Water Plant Locations." (ECF No. 14-16, Stevenson Email, PgID 310.)

In the summer of 2017, Lieutenant Arnold Sheard took charge of the fresh water treatment plants, becoming Massey's second-level supervisor. (ECF No. 14-14, Sheard Dep., PgID 291–92.) Massey's immediate supervisors at that time were

Sergeants Ernest Stevenson and Keith McLain. (*Id.* at PgID 291.) Soon after he took control of the fresh water plants, Lieutenant Sheard conducted an inspection of the plant "with reference to personnel appearance and equipment that they had." (*Id.* at PgID 300.) During this check, Sheard told Massey that she looked sloppy in her uniform and that her breasts looked like they were drooping. (ECF No. 14-2, Massey Dep., PgID 169.) Massey recalled Sheard thinking that her vest did not fit properly. (*Id.*) Sheard, on a second occasion, about a month later per Massey's recollection, told Massey that she needed a more supportive bra. (*Id.*)

Sheard testified that he told Massey that her uniform was "deplorable and didn't meet the standards of the operation" because she had spilled food on herself, had holes in the tops of her un-shined shoes, and because her vest did not fit correctly. (ECF No. 14-14, Sheard Dep., PgID 299–300.) He said that he was particularly concerned about the vest because it extended below her weapons in a way that made it impossible for her to reach them in an emergency. (*Id.* at PgID 300.) Sheard denied telling Massey that she needed a more supportive bra, but did testify that he told her that "perhaps she needed a garment that would assist her wearing . . . her vest under her shirt." (*Id.*) When asked what he meant by the word

"garment," Sheard responded, "[m]y wife wears a number of garments that will help support her to wear anything she wants to wear." (*Id.* at PgID 300–01.)

HR Generalist Parks-Turner recalled Massey's complaints of teasing about her breasts and comments about how her shirt fits, though she did not indicate when Massey made her complaints. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) Parks-Turner testified that HR did an investigation of Massey's complaints, but she could not recall any of the findings. (*Id.*) Parks-Turner was certain, however, that Terri Conerway, the HR manager, spoke with Chief of Security Jones and Lieutenant Sheard about how to better communicate with Massey going forward. (*Id.* at PgID 279.) Sheard denied ever knowing that Massey had complained about him. (ECF No. 14-14, Sheard Dep., PgID 292, 301, 304.)

### C.    Breast Reduction Surgery and FMLA Leave

Massey continued to experience teasing relating to her breast size at GLWA. (ECF No. 14-2, Massey Dep., PgID 170.) In June or July of 2016, Massey's fellow guard Rachel Rice told her that "[her] breasts were so big, it looked like [she] could trip over them." (*Id.* at PgID 171.) On another occasion, a class on September 24, 2017, Massey's coworkers were laughing as she came into the room and one of them told her that she looked "sloppy." (*Id.* at PgID 183.) Massey

11

interpreted this comment and their reaction as laughter about her breasts. (*Id.*) She then sat in the back of the classroom and heard them say "I wish the bitch would say something," and other comments she perceived as threatening. (*Id.*) Massey believes they said other things about her at that time, but could not recall any other specifics, except that fellow officer Robert Nunley told the class that he thought Massey abused her FMLA leave by using it too much. (*Id.* at PgID 183, 186.) This comment prompted applause from the rest of the class. (*Id.* at PgID 186.) Later that day, Massey overheard Sergeant Stevenson tell Officer Nunley, "[d]on't worry, shortly we'll be getting rid of her." (*Id.*)

Massey decided to get a breast reduction surgery in 2017. (ECF No. 14-2, Massey Dep., PgID 161.) She had been considering the surgery for a while—in June of 2016 Officer Yarnall wrote in his report that Massey told him that she was planning to get the breast reduction because many people had harassed her about her breast size over the years, so the surgery would be a confidence booster. (ECF No. 21-8, Yarnall Letter, PgID 698.) Parks-Turner also testified that Massey had told her that she had gotten tired of the teasing and was planning to get a breast reduction surgery in response. (ECF No. 14-13, Parks-Turner Dep., PgID 287.) Massey said that she wanted the surgery in part due to back and shoulder pain, but

also "to change the appearance of the way [she] looked because everybody thought it was sloppy at work where [she] got teased a lot." (ECF No. 14-2, Massey Dep., PgID 185.) She reported to the surgeon that she had shoulder and back pain. (ECF No. 14-40, Gupta Notes, PgID 444.)

Massey thought that she had gotten approved FMLA leave for her surgery on November 3, 2017. (ECF No. 14-2, Massey Dep., PgID 165.) Specifically, she thought she had leave from October 30th until November 17th. (*Id.*) She remembered filling out the necessary paperwork as soon as she found out that she was approved for the surgery by the clinic, and remembered talking to the administrator and hearing that she was approved. (*Id.* at PgID 161–63.) However, no one at GLWA was notified that Massey was approved and going on FMLA leave for those dates. (*See* ECF No. 14-7, Darty Dep., PgID 239 (HR not notified); ECF No. 14-6, McClain Dep., PgID 230 (supervisor not notified).) Massey did not tell her supervisors about the surgery because she did not want them to know "what was going on." (ECF No. 14-2, Massey Dep., PgID 207.)

The only record produced to the Court of Massey's FMLA leave status indicates that she was approved for intermittent leave of up to two three-hour appointments per week and two episodic incapacitates lasting up to three-hours

per episode per week.[1] (ECF No. 14-39, FMLA Letter, PgID 441.) Massey said that this leave was for her asthma. (ECF No. 14-2, Massey Dep., PgID 162.)

### D.    October 29, 2017 Incident and Aftermath

On October 29, 2017, Massey worked her last shift before her surgery at the northeast water plant. (ECF No. 14-2, Massey Dep., PgID 153.) She began her shift as the sole security guard at the plant at 7 a.m. (*Id.*) Throughout the day she conducted site checks of the plant—which required her to drive a GLWA van around the plant to make sure everything was locked and secured. (*Id.* at PgID 156.) On October 29, Massey did three site checks, including one from 11:29 a.m. to 12:16 p.m., all using vehicle 381006. (*Id.* at PgID 155–57; ECF No. 16-1, Fusion Center Log, PgID 498–99.) During this time, Massey was the only employee with access to the vehicle. (ECF No. 14-2, Massey Dep., PgID 155.)

At 12:56 p.m., Massey called Sergeant McLain and told him that the van was leaking water or antifreeze and was not heating up. (ECF No. 14-6, McLain Dep., PgID 230; ECF No. 16-1, Daily Activity Report, PgID 497.) Massey noticed

---

[1] The paperwork Plaintiff submitted with his Motion to Supplement (ECF No. 28) to prove that Massey was on FMLA leave at the relevant time is a copy of the letter approving Massey's intermittent leave, and therefore provides no new information to the Court. Plaintiff's Motion to Supplement (ECF No. 28) is therefore denied.

that the temperature gauge was all the way on "H," so she called McLain to let him know and ask what to do. (ECF No. 14-2, Massey Dep., PgID 158.) She also noticed drops of antifreeze on the ground after she parked the van and told McLain about the leak. (*Id.*) McLain told her to park it, told others not to drive it, and said it would be towed to the garage for service the next day. (ECF No. 14-6, McLain Dep., PgID 230.) Massey contacted McLain a second time, at 2 p.m., when she noticed a clear leak. (ECF No. 14-2, Massey Dep., PgID 159.)  McLain instructed Massey to write up an incident report regarding the problem. (*Id.* at PgID 158.)

As Massey's shift was wrapping up, she wrote out an incident report for her replacement officer, Nicholas Purcell, to type and send out. (*Id.* at PgID 160.) The report stated, in its entirety:

> On the Above Date and Time I Security Officer Nicole Massey observed temp gauge in vehicle 381006 was all the way on the H "hot." Upon further inspection I observed orange antifreeze leaking from the front of the vehicle. I then notified Fusion D. Woodmore and Sgt. McLain immediately. Unknown as to when or why it began leaking.

(ECF No. 16-1, Massey Report, PgID 493.) Officer Purcell, who noticed damage to the van upon further inspection, filled out his own incident report, which said:

> On the above date and time when I came onto the northeast site Nicole Massey informed me the site loaner vehicle #381006, had a

radiator leak an hour or so later I went out to see if I could figure out ware [sic] the unit was leaking. I observed a coolant stain on the gravel pad in front of the vehicle, as well as new damage on the front of the vehicle. 1. Front clip appears pulled out and away from fenders on both sides. 2. There is a bend in the A/C condenser lower left side.

Vehicle appears to have been "run aground" on something like a parking breaker or railroad tie. A quick check of the area and just about ten feet directly in front of the vehicle are two railroad ties that appear to have been recently pushed a proximately [sic] one foot forward. I notified fusion officer, Barry Meeks of my findings and I am taking pictures as instructed. Vehicle is unusable as the heavily leaking radiator will cause the vehicle to overheat causing severe damage to the engine.

(ECF No. 16-1, Purcell Incident Report, PgID 494.)

The next day the van was towed to the service garage. (ECF No. 14-26, Banka Dep., PgID 337.) At the garage, the mechanics found "accident damage to the front end of the van"—the front bumper cover was damaged and loose and the radiator had been punctured, causing the antifreeze leak. (ECF No. 14-27, Banka Email, PgID 340.) David Banka, who helps to manage the GLWA van fleet, then called Lieutenant Sheard to tell him about the damage and to request an accident report. (*Id.*; ECF No. 14-26, Banka Dep., PgID 338.)

After Lieutenant Sheard got Banka's call on October 30, he initiated an investigation into what happened to the vehicle. (ECF No. 14-14, Sheard Dep.,

PgID 294.) Security camera footage showed a person driving an undamaged van at 11:43 a.m. and a damaged van at 12:22 p.m. (ECF No. 16-1, Security Photos, PgID 521, 525.) Massey was the only security officer on site, and the only one with keys to the vehicle during that time, which was when she conducted her site check. (ECF No. 16-1, Investigation, PgID 491.) Officer Purcell found several parts of the van on a dirt road on the east of the plant, near a damaged orange cone that was bent around a piece of twisted rebar. (*Id.*) This evidence led Lieutenant Sheard to conclude that Massey had been in a single vehicle accident with concrete rebar and an orange warning cone that she failed to report. (*Id.* at PgID 487.) He thus determined that Massey had falsified her incident report. (*Id.*0

Massey denied being aware that she had been in an accident. (ECF No. 14-2, Massey Dep., PgID 161.) She stated that the ground was uneven, especially because the pavement was getting redone, so she thought it was just a normal day. (*Id.* at PgID 164.) She said that there was a "great possibility" that she ran over one of the railroad ties, but that she did not know. (*Id.* at PgID 165.)

According to Massey, Lieutenant Sheard called her on November 1, 2017 to ask about the vehicle and to ask her to return to work. (*Id.* at PgID 166.) Massey responded that she was unaware of any accident and reiterated her report that the

17

temperature gauge was on hot and antifreeze was leaking. (*Id.* at PgID 167.) Sheard denied ever calling Massey or attempting to contact her regarding the accident, except, perhaps, asking Sergeant Stevenson to contact her. (ECF No. 14-14, Sheard Dep., PgID 297.) Nevertheless, Massey remembered Sheard calling her on November 1st, which prompted her to notify her union that she was on FMLA leave for her surgery but that Sheard notified her about the vehicle and accused her of having an accident, which she denied. (ECF No. 14-2, Massey Dep., PgID 166.) Massey also testified that Sheard left her a voicemail while she was in surgery, asking her to give him a call. (*Id.* at PgID 167.)

On November 8, 2017, Massey talked to all three of her supervisors, Sheard, Stevenson, and McLain, who told her to return to work. (*Id.*) When she arrived, she was immediately taken for a drug test. (*Id.*) Massey then worked shifts every day through November 12th. (*Id.* at PgID 177.) On November 15th, Massey was called to a meeting with Lieutenant Slaughter, Chief of Security Jones, Sergeant Stevenson, and two people from the union. (*Id.*) The purpose of the meeting was to discipline Massey by issuing a "corrective action" for what Sheard had determined was falsification of a report, a "Group IV Offense" punishable by a 30-day

suspension without pay pending discharge. (ECF No. 14-33, Darty Email, PgID 428; ECF No. 16-1, Corrective Action Form, PgID 492.)

Lieutenant Sheard was instructed to begin the meeting by asking Massey to write a statement of facts regarding the damaged vehicle. (ECF No. 14-33, Darty Email, PgID 428.) If Massey complied, Sheard was to "take a caucus to review the information provided," before issuing the corrective action. (*Id.*) If not, Sheard was to proceed by reviewing his statement of facts with Massey and then issue the action. (*Id.*) During the meeting, Massey refused to sign the corrective action form, on the advice of the union president, Tracy Reynolds, who kept asking for more evidence of Massey's wrongdoing. (ECF No. 14-2, Massey Dep., PgID 178.) After that, Lieutenant Slaughter, who ran the meeting in Sheard's absence, issued the corrective action and suspended Massey for 30 days. (*Id.*; ECF No. 16-1, Corrective Action, PgID 487–92.)

Massey was terminated by letter on December 18, 2017. (ECF No. 14-35, Termination Letter, PgID 432.) The reason given for the termination was "[f]alsification of official documents in the course of conducting GLWA business." (*Id.*) It is not clear who made the decision to terminate her—Lieutenant Sheard indicated that it was his decision to suspend Massey due to his authority over

discipline, but that it was the HR department that ultimately decided to fire her. (ECF No. 14-14, Sheard Dep., PgID 296.) HR Manager Karen Darty, however, said that Sergeant Stevenson and Lieutenant Sheard made the recommendation to terminate Massey, but that all terminations must be approved by the CEO, Sue McCormick. (ECF No. 14-7, Darty Dep., PgID 237–38.)

In response to her termination, Massey filed a grievance with her union, as well as a charge with the EEOC. (ECF No. 14-2, Massey Dep., PgID 179; ECF No. 14-36, EEOC Charge, PgID 434.) In her EEOC charge, Massey alleged sexual harassment, gender discrimination, and retaliation. (ECF No. 14-36, EEOC Charge, PgID 434.) She was issued a Right-to-Sue Letter on November 7, 2018 (ECF No. 14-38, Right to Sue, PgID 438), and filed this suit on January 14, 2019. (ECF No. 1, Complaint.)

## III.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or

defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran*, 788 F.3d at 204.

Parties may cite "[m]aterials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to claim that a fact is or is not genuinely disputed. Fed. R. Civ. P. 56(c)(1)(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks

omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). That evidence must be more than "[c]onclusory assertions, supported only by [his or her] own opinions," *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008), and "more than mere speculation, conjecture, or fantasy." *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)). In other words, the party opposing summary judgment must provide evidence that does "more than simply show that there is some metaphysical doubt as to the

material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" Ibid. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

Of course, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.   ANALYSIS

Nathan, on behalf of Massey, brings claims of hostile work environment sexual harassment and retaliation against GLWA under Title VII, which makes it illegal for an employer to discriminate against an individual because of the individual's sex, and under ELCRA, the parallel Michigan statute that also bans workplace discrimination based on sex. 42 U.S.C. § 2000e-2(a); Mich. Comp. Laws § 37.2202(1)(a). Nathan also brings a retaliation claim under the FMLA. 29 U.S.C. § 2615. As explained below, Nathan's claims fail because he has not produced evidence showing a genuine issue of material fact on at least one key element of each claim. Before reaching the substance of Nathan's claims, however, Court must decide whether or not to rely on Plaintiff's Exhibits F, L, and M because GLWA claims that they are unauthenticated or otherwise inadmissible.

### A.   Evidence Questions

Plaintiff, in his Response, relies on three pieces of evidence, Exhibits F, L, and M, that Defendant argues are unauthenticated or otherwise inadmissible. Evidence is unauthenticated when the proponent has not produced "evidence

24

sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Unauthenticated documents submitted at the summary judgment stage must be disregarded because they will not be admissible at trial. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 427 (6th Cir. Feb. 13, 2014) (citing *Caresource*, 576 F.3d at 558–59).

Nathan labels Exhibit F, a document handwritten by Massey and addressed "to whom it may concern," as Plaintiff's Complaint to HR," and relies on it to support his claims that Sergeant McNair denied Massey FMLA leave when Massey "started her menstrual period due to the harassment while at work, which resulted in a significant amount of blood soaking through her pants" in 2016, that McNair and Massey's coworkers ridiculed Massey as a result of this incident, and that, on June 19, 2016, McNair "called [Massey] into her office and made thinly veiled threats about termination after [Massey] complained of Sergeant McNair's treatment of her in a formal review." (ECF No. 21, Response, PgID 557–59.) Exhibit F is also the only instance of Massey describing the 2012 bra incident as the supervisor requiring her to remove her shirt to prove that she was wearing a bra. (ECF No. 21-7, Exhibit F, PgID 694–95.) Defendant GLWA does not dispute

that Massey wrote the document, but does dispute the fact that it was ever given to GLWA. (ECF No. 22, Reply, PgID 800.)

Review of the record before the Court indicates that Exhibit F is not sufficiently authenticated as a complaint *received* by GLWA's HR department. Massey testified that she wrote it in connection with her 2016 EEOC and gave a copy of it to her union as part of a grievance, but that she did not recall whether she ever gave a copy to HR. (ECF No. 14-2, Massey Dep., PgID 191.) HR Generalist Parks-Turner, however, testified that she recalled seeing the document at some point, but did not know to whom Massey gave the document or when it ended up with GLWA. (ECF No. 14-13, Parks-Turner Dep., PgID 286.) Parks-Turner's testimony that she, "could say [she] think[s] [she] recalls seeing" the document after it eventually made its way from Massey's union rep to GLWA is too vague to support the assertion that it was a complaint submitted to the HR department during the relevant time period. This document also does not support Plaintiff's allegation that Sergeant McNair denied Massey's request for leave when her menstrual period soaked her pants in 2016, while she was employed by GLWA, because Massey's 2016 EEOC charge paperwork makes clear that this incident occurred in May of 2015, while she was employed by DWSD. (ECF No. 14-11,

EEOC Intake Form, PgID 272.) Thus, the Court does not consider Exhibit F evidence that the HR department had received a written complaint from Massey, nor as evidence that the period incident occurred in 2016.

GLWA also takes issue with Exhibit L, another handwritten document that Massey stated she prepared for either the EEOC or her union. (ECF No. 14-2, Massey Dep., PgID 186.) Plaintiff uses it to support claims that Lieutenant Slaughter confronted her and asked to sign a reprimand without any explanation of the allegations against her and that Sergeants McClain and Stevenson told her that she looked like a "hot ass mess" on the day that Lieutenant Sheard told her she needed a more supportive bra. (ECF No. 21, Response, PgID 560.) GLWA indicates that Nathan did not produce this document in discovery, and GLWA received only the odd numbered pages of the document through a Freedom of Information Act request. (ECF No. 22, Reply, PgID 800, ECF No. 22-3, Odd Pages of Exhibit L, PgID 815–19.)

Thus, GLWA argues that Nathan is not allowed to rely on Exhibit L under Federal Rule of Civil Procedure 37(c)(1), which bars parties from using information they failed to produce in discovery unless the failure was substantially justified or harmless. There is no information in the record as to why Plaintiff

failed to produce this document, and the failure was not harmless because GLWA had access to only half of the document until it received Plaintiff's Response. The Court agrees with GLWA—Exhibit L was submitted in violation of Rule 37(c)(1), and Plaintiff is not entitled to rely on it at this stage.

Finally, GLWA argues that Exhibit M, a photograph of a woman with large breasts with the handwritten statement, "[t]his was left on my locker @ work 3/2017," is unauthenticated and therefore inadmissible. (ECF No. 21-14, Exhibit M, PgID 720.) The Court agrees—there is no testimony in the record about this picture, and certainly no testimony that supports the fact that it was left on Massey's locker at work. Therefore, the Court does not rely on Exhibit M.

### B.    Hostile Environment Sexual Harassment

Nathan bases his Title VII and ELCRA hostile environment sexual harassment claims on Massey's complaints of teasing by coworkers about her breast size, as well as comments by her supervisors McNair and Sheard about her breasts and bra. (ECF No. 21, Response, PgID 568–73.) Sexual harassment that is "sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment" is unlawful under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotations

and citations omitted); 42 U.S.C. § 2000e-2. "The ELCRA hostile work environment analysis is identical to Title VII's analysis," and "Michigan courts often interpret ELCRA provisions using Title VII case law," so the following analysis applies to Nathan's claims under both laws. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).

A prima facie case of harassment based on a hostile work environment requires evidence that the plaintiff (1) is a member of a protected class, (2) was subjected to harassment through words or actions based on sex, (3) which harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment, and (4) that there is some basis for liability on the part of the employer. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009). GLWA concedes that Massey, as a woman, is a member of a protected class, and that she was subjected to harassment, but argues that Nathan cannot establish a genuine issue of material fact that (a) the harassment was based on Massey's sex, (b) it unreasonably interfered with her work performance, and (c) there is any basis for employer liability. (ECF No. 14, Motion for Summary Judgment, PgID 124.) The Court agrees that there is no genuine issue of material fact on the based-on-sex and

29

unreasonable-interference elements, and therefore grants summary judgment on this claim.

### 1. Based on Sex

The second element of a hostile environment claim, that the harassment is based on sex, requires proof "that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). This requirement prevents Title VII from "expanding into a general civility code" for the workplace. *Id.* In the Sixth Circuit, "*[a]ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (referencing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In a case involving allegations of man-against-woman sexual harassment, the based-on-sex element is met by a showing of "harassing behavior that is either lascivious in nature or that reflects an 'anti-female animus.'" *Wanchik v. Great Lakes Health Plan. Inc.*, 6 F. App'x 252, 263 (6th Cir. Mar. 2, 2001). When there are allegations of sexual harassment perpetrated by someone with the same gender

30

as the plaintiff, "[a] trier of fact may infer that the harassment occurred because of sex when the plaintiff can produce (1) 'credible evidence that the harasser was homosexual,' (2) evidence that 'make[s] it clear that the harasser is motivated by general hostility to the presence of [the same sex] in the workplace,' or (3) 'comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Wasek*, 682 F.3d 463, 467–68. By contrast, behavior motivated by personal dislike does not create an inference of discrimination. *See Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) ("Personal conflict does not equate with discriminatory animus.") (internal citation omitted).

Here, Nathan alleges that the comments about Massey's breasts that were made by her coworkers, Sergeant McNair, and Lieutenant Sheard amounted to harassment "obviously based on her sex," because comments about breasts are direct comments about her sex. (ECF No. 21, Response, PgID 569.) This argument, while appealing, is difficult to square with the case law, which requires harassment born out of either sexual desire or general animus—not just the use of sex-specific terms. *See Oncale*, 523 U.S. at 80 ("We have never held that workplace harassment, even harassment between men and women, is automatically

discrimination because of sex merely because the words used have sexual content or connotations.") The comments here—that Massey's breasts were drooping, that her bra was unsupportive and made her uniform look sloppy, and the teasing about their size—do not clearly suggest either sexual desire or anti-woman animus so much as they suggest a problem with Massey's size. In fact, Parks-Turner testified that a male employee was also asked about the fit of his shirt because of the size of his body. (ECF No. 14-13, Parks-Turner Dep., PgID 280.) That implies that it was Massey's size that caused the harassment, not the fact that she was a woman.

Further, two of Massey's alleged harassers, Sergeant McNair and coworker Rachel Rice, who told Massey her breasts were so large that she could trip over them (ECF No. 14-2, Massey Dep., PgID 170), are women. Thus, under *Wasek*, proof that McNair and Rice are homosexual, that they have a general hostility to women in the workplace, or that they treat men more favorably is required. 682 F.3d at 467–68. Massey does not offer any such proof.[2] *See also Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 297 (6th Cir. May 11, 2015)

---

[2] Massey testified that she and McNair have "a real bad history" of McNair treating her badly, but she agreed that it was not about disability or gender, which suggests that McNair was motivated by personal dislike rather than discriminatory animus. (ECF No. 14-2, Massey Dep., PgID 634); *Morris*, 201 F.3d at 791.

(finding that a female supervisor's occasional comments about the plaintiff's breasts and references to herself as "the bitch in charge" were insufficient evidence of sexual desire or anti-woman animus to establish this element). Thus, under the controlling case law, the fact that Massey was harassed about her breast size is not enough to show that the harassment was "based on sex."

### 2. Unreasonable Interference

GLWA also argues that Nathan has not produced enough evidence on the third element of a hostile environment claim—that the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment. *Gallagher*, 567 F.3d at 270. The test is whether, in the totality of the circumstances, the conduct is so severe and pervasive that a reasonable person would find the environment hostile or abusive. *Harris*, 510 U.S. at 21. The plaintiff must also subjectively perceive the environment to be hostile or abusive. *Id.* This element does not require proof that the plaintiff's productivity declined, only proof that the harassment made it harder to do the work. *Williams*, 187 F.3d at 567.

Because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which

are not fully captured by a simple recitation of the words used or the physical acts performed," *Oncale*, 523 U.S. at 81–82, the totality of the circumstances includes factors such as the frequency of the harassment, whether it is physically threatening or merely offensive, the degree to which it interferes with the employee's work performance, and any other relevant circumstances. *Harris*, 510 U.S. at 23. "[W]here individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Williams*, 187 F.3d at 563. However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment . . . [the] conduct must be extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted).

In this case, Nathan has produced evidence showing that two of Massey's supervisors told her, on at least three occasions while she worked at GLWA, that her breasts were drooping or that her bra was not sufficiently supportive. (ECF No. 14-2, Massey Dep., PgID 169–171; ECF No. 14-13, Parks-Turner Dep., PgID 279.) Nathan has also produced evidence showing that Massey's coworkers at GLWA teased Massey about her breast size and the "sloppy" fit of her uniform.

34

(ECF No. 14-2, Massey Dep., PgID 170–71, 183.) Though Massey identified only a few specific incidents, HR Generalist Parks-Turner testified that Massey had complained to her about being teased for the fit of her shirt and the size of her breasts. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) Further, there is evidence that one of Massey's reasons for getting her breast reduction surgery is because she was tired of the teasing. (*See* ECF No. 21-8, Yarnall Letter, PgID 698 (planning surgery to boost confidence after harassment about her breast size for  years); ECF No. 14-13, Parks-Turner Dep., PgID 287 (planning surgery because she was tired of teasing); ECF No. 14-2, Massey Dep., PgID 185 (wanting surgery "to change the appearance of the way [she] looked because everybody thought it was sloppy at work where [she] got teased a lot"). However, other evidence suggests that much of the teasing Massey endured at work was about her FMLA leave, such as being called "the queen of FMLA" in early 2016 by McNair, Jones, and others, and being criticized for using her leave "too much" in September of 2017. (ECF No. 14-2, Massey Dep., PgID 186, 190.)

There is little doubt that Massey found that the teasing and comments about her breasts made the environment hostile—it was a factor that motivated her surgery—but the objective inquiry is closer. It is not clear how frequently

supervisors or coworkers commented about Massey's breasts. Nathan produced evidence of five comments in the two years that Massey worked for GLWA, but Massey maintained that the teasing was frequent throughout her time with both DWSD and GLWA. The comments were not physically threatening, and there is no evidence that any of the specific comments or general teasing impacted Massey's work performance. *See Harris*, 510 U.S. at 23 (identifying factors). On these facts, the conduct at issue was not objectively extreme enough to support a finding of hostile work environment harassment.

It is relevant that Massey's supervisors and coworkers from DWSD became her supervisors and coworkers at GLWA after the transition, so, though GLWA is not liable for any harassment that occurred when DWSD was Massey's employer, the accumulated effect of the teasing Massey endured at GLWA was greater. That, however, is not enough to produce a genuine issue of material fact on the severity of the harassment, so GLWA is entitled to summary judgment on this claim.

### 3.  Employer Liability

GLWA's final argument regarding the hostile environment claim is that there is no basis for employer liability. (ECF No. 14, Motion for Summary Judgment, PgID 126–28.) An employer is liable for the sexual harassment of its

employee when that employee is a "supervisor with "immediate (or successively higher) authority over the [plaintiff] employee" and "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 807–08. A supervisor is a person "possessing the authority to effect a tangible change in a victim's terms or conditions of employment." *Vance v. Ball State Univ.*, 570 U.S. 421, 439 (2013). "Tangible employment actions are those that effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Equal Employment Opportunity Comm'n v. AutoZone, Inc.*, 692 F. App'x 280, 283 (6th Cir. June 9, 2017) (internal quotation and citation omitted).

If no tangible employment action arises from the supervisor's harassment, the employer "may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Faragher*, 524 U.S. at 807 (internal citation omitted). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take

37

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

In this case, Lieutenant Sheard was a supervisor. Although his authority to hire and fire is limited to recommendations that are signed off on by the CEO, (ECF No. 14-7, Darty Dep., PgID 237–38), there is no evidence that the CEO personally interacts with security officers, so this appears to be a situation where the CEO has "effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance*, 570 U.S. at 447. Further, even if Lieutenant Sheard did not have the authority to hire or fire, he did have the authority to make disciplinary decisions, such as his decision to suspend Massey for 30 days without pay. (ECF No. 14-7, Darty Dep., PgID 237; ECF No. 14-14, Sheard Dep., PgID 296.) A month-long suspension without pay is, without question a tangible employment action. Therefore, Sheard is a supervisor.

Sergeant McNair is also a supervisor. HR Manager Darty testified that sergeants can make disciplinary decisions (ECF No. 14-7, Darty Dep., PgID 237), and Sergeant McNair issued Massey a five-day suspension in June of 2016, indicating that she did have authority to take tangible employment actions. (ECF No. 21-10, 2016 Corrective Action, PgID 703.) Defendant conceded, during the

June 4, 2020 hearing, that Sergeants have the authority to suspend without pay, which is a tangible employment action.

Plaintiff does not argue that the harassment relating to her breast size culminated in a tangible employment action,[3] so the inquiry becomes whether there is a genuine issue of material fact on GLWA's affirmative defense. The first prong of the affirmative defense, reasonable care to prevent and promptly correct sexually harassing behavior, is generally met when the employer proves that it has promulgated and enforced a sexual harassment policy. *Gallagher*, 567 F.3d at 275. The second prong is satisfied when there is evidence that the employee failed use one or more of the available reporting mechanisms and a corresponding lack of evidence that she was under a credible threat of retaliation. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008). For instance, in *Gallagher*, the Sixth Circuit found the plaintiff's decision not to use one of the alternative reporting mechanisms but to report harassment informally to her manager, who did nothing to correct the behavior, unreasonable because there was no credible threat of retaliation. 567 F.3d 263.

---

[3] She does argue that her complaints about the harassment prompted retaliation in the form of her termination, which argument is addressed below.

There is no dispute that GLWA had a sexual harassment policy in effect. (ECF No. 14-8, Policy, PgID 256–60.) The second prong is less clear. Massey told HR Generalist Parks-Turner that she was feeling harassed by the comments and teasing about her breasts and bra, but did not file a formal complaint. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) Massey testified that she complained to Parks-Turner specifically about Lieutenant Sheard's comments about her breasts and bra. (ECF No. 14-2, Massey Dep., PgID 169.) This complaint, according to Parks-Turner, prompted an investigation that led to the HR manager speaking with Chief of Security Jones and Lieutenant Sheard about how to better communicate with Massey. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) Given that Massey's complaint led to an effort to correct the behavior, her decision to report informally was reasonable. GLWA has failed to establish the second prong of the affirmative defense, so Massey has shown that there is some basis for employer liability here.

Massey also alleges harassment by her coworkers. "Employer liability for co-worker harassment stems directly from the employer' actions, or lack thereof, in response to the harassment: The plaintiff must show that the employer knew or should have known of the charged [sexual] harassment and failed to implement

40

prompt and appropriate corrective action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).

Here, Massey's complaints to Parks-Turner, who notified her manager, who talked to Jones and Sheard, provided sufficient notice of the charged harassment. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) Additionally, Officer Yarnall's letter, which prompted an investigation of Massey, provided notice that Massey felt harassed about her breast size. (ECF No. 21-8, Yarnall Investigation and Letter, PgID 697–98.)

GLWA implemented prompt and appropriate corrective action to Massey's complaints to Parks-Turner, but not to the allegation within Yarnall's letter. HR investigated and spoke to Jones and Sheard about the treatment of Massey after one of her complaints, though there is no formal record of that investigation. (ECF No. 14-13, Parks-Turner Dep., PgID 279.) Given that Massey's complaints were informal, an informal investigation and corrective conversation was prompt and appropriate action. There was no investigation of Massey's specific complaints when GLWA received notice, albeit secondhand notice, of those complaints from Yarnall's letter. (ECF No. 21-8, Yarnall Investigation and Letter, PgID 697–98.) Instead there was an investigation into whether Yarnall felt comfortable working

with Massey. (*Id.*) A jury could find that, in that situation, GLWA failed to implement prompt and appropriate action. Accordingly, there is a genuine issue of material fact on the question of employer liability. However, Plaintiff's failure to establish genuine factual disputes on two other elements of this claim requires the Court to grant Defendant summary judgment on this claim.

### C.  Retaliation

Nathan, on behalf of Massey, brings retaliation charges against GLWA under Title VII and ELCRA. A prima facie case of retaliation requires proof:

> (1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Williams*, 187 F.3d at 568. Once the plaintiff produces evidence showing each element of the prima facie case, the burden of production shifts to the employer to articulate a non-retaliatory reason for the termination. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). If the employer articulates such a reason, the burden of production shifts back to the employee, who bears the burden of persuasion throughout, to show that the employer's reason was pretext. *Id.* at 614. Proof of retaliation claims under ELCRA is identical. *Redlin*, 921 F.3d at 614.

42

In this case, Massey engaged in the protected activity of complaining to HR about what she perceived to be sexual harassment. *See Wasek*, 682 F.3d at 469 ("[C]omplaining about allegedly unlawful conduct to company management is classic opposition activity.") GLWA knew that Massey engaged in that activity because her complaints resulted in a conversation with Lieutenant Sheard and Chief of Security Jones. *See id.* at 470 (finding knowledge based on complaint to management). Massey was suspended and then terminated, both materially adverse employment actions. *Id.* The question for the Court is whether there is sufficient evidence of causation.

At the prima facie stage, the burden of production is minimal—"all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th. Cir. 2007). Temporal proximity alone can be sufficient to establish the fourth element when the adverse action closely follows the protected activity. *Redlin*, 921 F.3d at 615. Several courts have found that a "two- to three-month time lapse between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir.

2018) (lapse of just over two months sufficient on its own) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 897 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases)).

The relative timing of the stated reason for the adverse action and the protected conduct is also important in the causation analysis. In *Bailey v. Oakwood Healthcare, Inc.*, causation was absent when the termination was several months removed from the protected conduct and the stated reasons for the termination arose after the protected conduct. 732 F. App'x 360, 368 (6th Cir. Apr. 23, 2018).

If the lapse in time between the protected conduct and adverse action is longer, more evidence of causation must be produced. *See Redlin*, 921 F.3d at 615 (citing *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 320–21 (6th Cir. 2007) where time lapse of "roughly three months" was insufficient on its own to establish causation). Comparator evidence helps establish causation. In *Redlin*, evidence that another employee committed the same violations as the plaintiff but did not suffer the same materially adverse action supported a causal link. 921 F.3d at 608–11.

Here, the record is vague regarding exactly when Massey complained to Parks-Turner, so it is difficult to analyze the temporal proximity of her complaint and her suspension. It is clear from the record that Massey complained before October 29, 2017, the date of the incident that GLWA identifies as the reason for

her suspension and termination. So, like the plaintiff in *Bailey*, the stated reason for the adverse action arose after the protected activity, suggesting that it was an intervening cause. 732 F. App'x at 368. Further, Nathan has not identified any evidence that another officer who was believed to have falsified an incident report was not suspended and then terminated. *Contra Redlin*, 921 F.3d at 608–11.

Nathan does not identify any evidence to support a finding of causation, except for Sergeant McNair calling Massey a "snitch" in 2016. (ECF No. 21, Response, PgID 575.) Sergeant McNair, however, was not Massey's supervisor at the time of her suspension and termination, and did not play any role in the decision, so this evidence is irrelevant. Plaintiff has failed to establish causation and therefore failed to establish a prima facie case of retaliation.

Even if Plaintiff could make some showing on the causation element, the claim would fail on the question of pretext. To show pretext, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Plaintiff's only argument on pretext is that Massey did not know she had been in an accident and therefore her statement in the incident report, "[u]nknown as to when or why it began leaking," (ECF No. 16-1, Massey

Report, PgID 493) was not false. (ECF No. 21, Response, PgID 575.) Yet, Massey's genuine belief that she was not in an accident is irrelevant.

The pretext inquiry here is governed by the "honest-belief rule," which "provides that an employer is entitled to summary judgment on pretext" if it took the materially adverse action based on the honestly held belief that the plaintiff committed misconduct that warranted the action. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (internal quotations omitted). "The key inquiry is . . . whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* at 591 (internal citation and quotation omitted).

In this case, there is ample evidence that GLWA investigated the damage to the van, came to the reasoned decision that the driver of the van, who had to be Massey, had hit or driven over a railroad tie and a cone, an accident that the driver likely noticed, and so concluded that her incident report, which did not mention an accident, was falsified. (*See* ECF No. 16, Corrective Action Form and Report, PgID 487–535.) The investigation could have been more thorough, and especially could have been improved by interviewing Massey, but there is no evidence contradicting the conclusion that the decision-makers, Sheard, Stevenson, and the

46

CEO, McCormick, honestly believed that Massey falsified the report. Therefore, Plaintiff has failed to show a genuine issue of material fact on the question of pretext. Accordingly, the Court grants GLWA's Motion for Summary Judgment (ECF No. 14) on Nathan's Title VII retaliation claims.

### D.     FMLA Retaliation

Nathan's final claim, though it is listed as two separate counts in the Complaint, is for retaliation/discrimination in violation of the FMLA, 29 U.S.C. § 2615. (ECF No. 1, Complaint, PgID 8–10.) A prima facie case of retaliation/discrimination under the FMLA requires proof that:

> (1) [the employee] was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). Proof of the causal connection requires "some type of retaliatory intent," *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016), but the burden of proof at this stage is minimal. *See Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

The second element is missing here. It is undisputed that, throughout her employment at both DWSD and GLWA, Massey was approved for intermittent

FMLA leave due to her asthma. (*See, e.g.*, ECF No. 14-39, FMLA Letter, PgID 441.) There is no evidence that Massey took any FMLA leave for her asthma at any time in close proximity to her suspension and termination. Further, there is no evidence that anyone at GLWA knew that Massey meant to take FMLA leave for her breast reduction surgery, especially since she did not tell any of her supervisors about the planned leave. (*See* ECF No. 14-7, Darty Dep., PgID 239 (HR not notified); ECF No. 14-6, McClain Dep., PgID 230 (supervisor not notified); ECF No. 14-2, Massey Dep., PgID 207.) Therefore, GLWA lacked notice that Massey was exercising her rights under the FMLA.

Because none of Massey's supervisors knew that she was on FMLA leave, no credible causation argument can be made. This is so despite the fact that Massey's leave coincided with her termination. Further, under the burden-shifting framework for FMLA retaliation claims, Massey would not be able to show that GLWA's stated reason for the suspension was pretextual. The pretext inquiry for FMLA claims is the same as that for Title VII retaliation claims, including the application of the honest-belief rule. *See Seeger*, 681 F.3d at 285–86 (6th Cir. 2012) (applying honest-belief rule in pretext inquiry in FMLA case). So, for the same reasons that Nathan cannot show pretext for Title VII purposes, he cannot

48

show it here. Thus, the Court grants Defendant's Motion for Summary Judgment (ECF No. 14) on the FMLA claim.

## V.    CONCLUSION

The Court GRANTS Defendant Great Lakes Water Authority's Motion for Summary Judgment (ECF No. 14) and DISMISSES the case.

IT IS SO ORDERED.


Dated: June 9, 2020                         s/Paul D. Borman
                                            Paul D. Borman
                                            United States District Judge

49